**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| ECOLAB INC. | ) |
| | ) |
| | )   Civil Action No. |
| Plaintiff/Counterclaim Defendant, | )   0:14-cv-00495-JNE-SER |
| | ) |
| v. | ) |
| | ) |
| GURTLER CHEMICALS, INC. D/B/A | ) |
| GURTLER INDUSTRIES, INC. | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**

**MOTION FOR AN AWARD OF ATTORNEY'S FEES**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………………i

I.      GURTLER IS UNDENIABLY THE PREVAILING PARTY……………….......2

II.     THIS CASE IS EXCEPTIONAL AND STANDS OUT FROM OTHERS……....3

        A.     Ecolab's Litigation Position Was Exceptionally Weak…………................7

        B.     There Is Ample Evidence Of Inequitable Conduct………… ....................10

               1.     Ecolab attempts to hide the full disclosure of DE335
                      from the USPTO…………...................................................10

               2.     Ecolab failed to disclose numerous other material references…......15

        C.     Ecolab Keeps Case Hanging Over Gurtler For As Long As Possible……18

III.    GURTLER'S REQUESTED FEES ARE REASONABLE………....................21

        A.     The Rates Charged Are Reasonable…………...................................22

               1.     GBC's rates are reasonable. …….......................……22

               2.     GKWW's rates are reasonable. …………...........................  23

               3.     Local counsel charged reasonable rates…………...............24

        B.     The Amount Of Time Billed Is Reasonable…………..............................24

IV.     CONCLUSION…………...................................................................28

## TABLE OF AUTHORITIES

35 U.S.C. § 285.................................................................................2, 4, 21, 25, 28

37 C.F.R. § 1.56..............................................................................................6

37 C.F.R. § 1.555............................................................................................6

Arrow Int'l, Inc. v. Spire Biomedical, Inc., 635 F. Supp. 2d 46 (D. Mass. 2009)...............6

Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461 (Fed. Cir. 1988)...................................6

Bywaters v. United States, 670 F.3d 1221 (Fed. Cir. 2012).......................................22, 26

Central Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573 (Fed. Cir. 1983)..................25

Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309 (Fed. Cir. 2006).................6

Exergen Corp. v. Brooklands Inc., 290 F. Supp. 3d 113 (D. Mass 2018).........................6

Fox v. Vice, 563 U.S. 826 (2011).......................................................................22

Handgards v. Ethicon, 601 F. 2d. 286 (9th Cir. 1979).........................................9

Hensley v. Eckerhart, 461 U.S. 424 (1983) ........................................................21, 22

Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 134 S. Ct. 1744 (2014). ...................2

Highway Equip. Co. v. FECO, Ltd., 469 F.3d 1027 (Fed. Cir. 2006). ..........................2, 3

Howes v. Medical Components Inc., 761 F. Supp. 1193 (E.D. Pa. 1990) .................25, 26

IA Labs CA, LLC v. Nintendo Co. Ltd., No. 10-833, 2012 U.S. Dist. LEXIS 61080
    (D. Md. May 1, 2012) ...............................................................................25

Impax Labs., Inc. v. Aventis Pharms. Inc., 468 F.3d 1366 (Fed. Cir. 2006) .....................7

Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479 (Fed. Cir. 2016) ...........5

M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335
    (Fed. Cir. 2006).......................................................................................6, 7

M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc., Case No. 14-cv-4857,
        (D. Minn., February 3, 2017)....................................................................5

MTS Sys. Corp. v. Hysitron Inc., 639 F. Supp. 2d 996 (D. Minn. 2009) .........................26

Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545 (2014). .................4, 5

Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182 (Fed. Cir. 1993) .............6

Perdue v. Kenny A, 559 U.S. 542 (2010)..........................................................................21

Power Mosfet Techs., L.L.C. v. Siemens AG, 378 F.3d 1396 (Fed. Cir. 2004) .................2

PPG Indus. v. Celanese Polymer Specialties Co., 840 F.2d 1565 (Fed. Cir. 1988) .........25

Pragmatus Telecom LLC v. Newegg Inc., 625 F. Appx. 528 (Fed. Cir. 2015) .................3

Raniere v. Microsoft Corp., 887 F.3d 1298 (Fed. Cir. 2018). .............................................3

Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs.,
        858 F.3d 1383 (Fed. Cir. 2017). ...............................................................5

Smith & Nephew, Inc. v. Interlace Med., Inc., 955 F. Supp. 2d 69 (D. Mass. 2013)..........6

SSL Servs., LLC v. Citrix Sys., 769 F.3d 1073 (Fed. Cir. 2014). .....................................2

Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276 (Fed. Cir. 2011)..................5

U.S. Pat. No. 6,262,013 ("the '013 patent") should have never issued. Plaintiff Ecolab ("Ecolab") sued Defendant Gurtler Chemicals, Inc. d/b/a Gurtler Industries, Inc. ("Gurtler") for patent infringement based solely on the '013 patent. Had Ecolab conducted even a modicum of review of its own patent and its own conduct at the European Patent Office, it would have come to the same conclusion that Gurtler and the United States Patent and Trademark Office ("USPTO") came to: the claims of the '013 patent were invalid. Despite several requests from Gurtler, Ecolab refused to acknowledge the plain facts and its own admissions, trapping Gurtler in this lawsuit.

During this lawsuit, Gurtler was forced to respond to multiple rounds of discovery and an aggressive ligation style from Ecolab's counsel. While the present lawsuit was eventually stayed, thereby minimizing, but not eliminating the costs to Gurtler, Gurtler nevertheless had to defend itself in this case and fulfill its obligations. Meanwhile, at the USPTO, Ecolab took every opportunity to drag out the reexaminations, keeping this baseless lawsuit pending as an ever-looming threat against Gurtler, until the patent was on the eve of its original expiration date.

If Ecolab would have simply been forthcoming with the USPTO during the original prosecution of the '013 patent, the original claims would have never been issued and this case would have never been brought. Similarly, if Ecolab would have acknowledged its own previous statements and characterization of the prior art from the outset of the case, the case would have ended long ago. Ecolab instead made the strategic decisions to do none of these in order to keep Gurtler under the risk of infringing a patent

Ecolab knew, or willfully ignored, was invalid. Simply put, Ecolab chose to ignore the facts and press on in this case when any reasonable entity would have recognized the faults that were the result of Ecolab's own actions.

In view of the totality of the circumstances, this case is more than Ecolab was ultimately wrong. Rather, Ecolab's actions stand out from other patent cases in view the complete lack of any strength in its case and its efforts to improperly use this forum to harm its smaller competitor for as long as it could. As the prevailing party, Gurtler should be reimbursed its reasonable attorney's fees under 35 U.S.C. § 285 since this case should have never been brought had Ecolab acted properly.

## I.    GURTLER IS UNDENIABLY THE PREVAILING PARTY

A district court's determination under 35 U.S.C. § 285 is reviewed under an abuse of discretion. Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., 134 S. Ct. 1744, 1749 (2014). Whether a party is a prevailing party under 35 U.S.C. § 285 "is a matter of Federal Circuit law." Power Mosfet Techs., L.L.C. v. Siemens AG, 378 F.3d 1396, 1407 (Fed. Cir. 2004). The Federal Circuit has held that the "prevailing party" is the party that "received at least some relief on the merits," and "[t]hat relief must materially alter the legal relationship between the parties by modifying one party's behavior in a way that 'directly benefits' the opposing party." SSL Servs., LLC v. Citrix Sys., 769 F.3d 1073, 1086 (Fed. Cir. 2014) (internal citations omitted). Furthermore, the Federal Circuit has explained that

> as a matter of patent law, the dismissal with prejudice, based on the covenant [not to sue] and granted pursuant to the district court's discretion under Rule 41(a)(2), has the necessary judicial imprimatur to constitute a judicially sanctioned change

in the legal relationship of the parties, such that the district court properly could entertain [a party's] fee claim under 35 U.S.C. § 285.

Highway Equip. Co. v. FECO, Ltd., 469 F.3d 1027, 1035 (Fed. Cir. 2006). Finally, a dismissal with prejudice is "tantamount to a judgment on the merits." Raniere v. Microsoft Corp., 887 F.3d 1298, 1303 (Fed. Cir. 2018).

In this case, Ecolab provided Gurtler with a covenant not to sue for the patent-in-suit and then moved to dismiss its complaint with prejudice. Doc.[1] 66. The Court granted Ecolab's request and dismissed the claims of patent infringement with prejudice. Doc. 76. Gurtler's status as the prevailing party in this case cannot reasonably be challenged. Indeed, the Federal Circuit recently held that when a dismissal with prejudice is coupled with a covenant not to sue (like this case), the dismissed party (*i.e.*, Gurtler) "***must be*** regarded as the prevailing party." Pragmatus Telecom LLC v. Newegg Inc., 625 F. Appx. 528, 529-30 (Fed. Cir. 2015) (per curium) (emphasis added).

Thus, Gurtler is the prevailing party in this case, and therefore has the right to ask this Court to declare the case "exceptional."

## II.    THIS CASE IS EXCEPTIONAL AND STANDS OUT FROM OTHERS

This case is an exceptional case because it stands out from other patent cases most notably because Ecolab's position was so weak. Indeed, the weakness is easily proven by Ecolab's own statements made to obtain a patent outside the US and statements it chose to willfully ignore and withhold in the present case. However, the totality of circumstances analysis goes beyond the weakness of Ecolab's position and is further

---

[1] References to docket entries in this case are with the abbreviation "Doc. ##."

based on the fact that *had* Ecolab acted properly years ago, the '013 patent would have never issued and this case would have never been filed. Furthermore, the exceptionality is supported by Ecolab's actions before the USPTO during the reexamination, in which Ecolab dragged this case out for as long as possible. Accordingly, upon reviewing the totality of Ecolab's actions, it is clear that this case is "exceptional" and stands out from one in which Ecolab merely lost and Gurtler won.

In 2014, the Supreme Court construed "exceptional" under 35 U.S.C. § 285 and held that an exceptional case "is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). In holding so, the Supreme Court overturned precedent that required a party moving for fees to show by clear and convincing evidence that a case was both objectively baseless and subjectively brought in bad faith. Id. at 553. Instead of the previously, overly rigid test, the Supreme Court held that for an award of fees under 35 U.S.C. § 285, a court should determine whether a case is exceptional on a case by case basis, examining the totality of the circumstances under a lower, preponderance of the evidence standard. Id. at 554, 557-8. Notably, the actions need not rise to the level of sanctionable conduct. Id. at 555. Furthermore, in considering the "totality of the circumstances," a court may consider "'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the

need in particular circumstances to advance considerations of compensation and deterrence.'" Id. at n.6

One factor courts have examined when determining whether to award fees is whether the pre-suit investigation is adequate to support the claims alleged. M-I Drilling Fluids UK Ltd. v. Dynamic Air Inc., Case No. 14-cv-4857, page 17 (D. Minn., February 3, 2017) and cases cited therein; Declaration of Patrick J. Smith[2], herewith, Exhibit A. Furthermore, even if the facts available to the party *before* the suit is filed might have been adequate to support the claims in the complaint, the party must take into account new information brought to its attention after the suit is filed. Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479, 483 (Fed. Cir. 2016). While many courts weighing an "exceptional" determination have examined a pre-suit *infringement* investigation, recently the Federal Circuit held that it was ***clear error*** for a district court to disregard the patentee's willful ignorance of the ***prior art*** when examining the strength of a patentee's case in determining whether to award attorneys' fees. Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., 858 F.3d 1383, 1388 (Fed. Cir. 2017).

In addition to the strength of the case, evidence of inequitable conduct is relevant to the totality of the circumstances and the exceptionality determinization. Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1289 (Fed. Cir. 2011) ("[P]revailing on a claim of inequitable conduct often makes a case 'exceptional.'"). In fact, even though each and every claim of the '013 patent is invalid, this Court should still consider the

---

[2] References to Exhibits from the attached Declaration of Patrick J. Smith are hereinafter referred to as "Exhibit ##."

facts underlying the issues of inequitable conduct because those facts "bear[s] on the question of whether the case is 'exceptional'." Exergen Corp. v. Brooklands Inc., 290 F. Supp. 3d 113, 120 (D. Mass. 2018) *quoting* Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1466 (Fed. Cir. 1988); Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1188 n.6 (Fed. Cir. 1993) (per curiam) ("This issue is not mooted by our decision holding the patent invalid in view of KLM's motion for attorney fees.").

The issues underlying inequitable conduct determinations are relatively well settled. Each individual who files or prosecutes a patent application has "a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability." 37 C.F.R. § 1.56; M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., 439 F.3d 1335, 1339 (Fed. Cir. 2006). Furthermore, this duty of disclosure applies equally to the reexaminations. 37 C.F.R. § 1.555. This duty extends not only to the inventor, but to all other persons who are substantively involved in the patent prosecution. Smith & Nephew, Inc. v. Interlace Med., Inc., 955 F. Supp. 2d 69, 72 (D. Mass. 2013).

Material information is information "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Arrow Int'l, Inc. v. Spire Biomedical, Inc., 635 F. Supp. 2d 46, 58 (D. Mass. 2009) *quoting* Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1315 (Fed. Cir. 2006).

A breach of this duty may result in a finding of inequitable conduct, which will invalidate the patent entirely, if the undisclosed information is material to

patentability and there was an intent to deceive the PTO.  M. Eagles Tool Warehouse, Inc., 439 F.3d at 1339; Impax Labs., Inc. v. Aventis Pharms. Inc., 468 F.3d 1366, 1375 (Fed. Cir. 2006) ("If inequitable conduct occurred with respect to one or more claims of an application, the entire patent is unenforceable.").

Upon examining the totality of the circumstances of this case, including the weakness of Ecolab's patent, the fact that the claims were clearly invalid based on Ecolab's own statements, the actions Ecolab took to hide and obfuscate material prior art references, and Ecolab's actions to drag this case out, this Court should conclude that this case stands out from others, and, thus, is exceptional.

### A.   Ecolab's Litigation Position Was Exceptionally Weak

In an attempt to obtain a European patent for the same "invention" as the patent-in-suit, Ecolab amended a European counterpart patent application to state:

> DE 39 29 335 discloses a laundry cleaning method comprising a ***first step of contacting solid laundry items with an alkaline detergent*** and then a ***second step of contacting these items with an organic peracid composition***.

Doc. 49-5 ¶ 0008 (emphasis added).  In arguing the patentability of its amended claims in the European counterpart patent application, Ecolab argued that this reference, DE 39 29 335 (herein, "DE335"),

> discloses a laundry cleaning method comprising a ***first step of contacting soiled laundry items with an alkaline detergent*** and then a ***second step of contacting these items with an organic peracid composition***.

Exhibit B, page 2 (emphasis added).

This is notable because in the present case, Ecolab accused Gurtler and its customers of infringing the '013 patent by:

> *first contacting soiled laundry items with an alkaline detergent* to form a treated laundry item, and *second contacting the treated laundry item with a composition comprising hydrogen peroxide, an organic carboxylic acid, and a resulting peracetic acid*.

Doc. 52 page 3 (emphasis added). Specifically, Ecolab asserted, *inter alia*, claims 1 and 24 of the '013 patent against Gurtler.  Doc. 52 page 3.

As can be seen in the below table, the exact processes of these claims, which Ecolab claimed Gurtler was infringing, were, according to Ecolab, known in and disclosed by the prior art.

|  | Step one | Step two |
|---|---|---|
| Gurtler allegedly infringing process<br><br>Doc. 52, page 3 | contacting soiled laundry items with an alkaline detergent | second contacting the treated laundry item with a composition comprising hydrogen peroxide, an organic carboxylic acid, and a resulting peracetic acid |
| Claim 1<br><br>Doc. 1-1, claim 1 | contacting soiled laundry items with an alkaline detergent to form a treated laundry item | contacting the treated laundry item with a peracid composition comprising hydrogen peroxide, an organic carboxylic acid, and a resulting organic peracid |
| Claim 24<br><br>Doc. 1-1, claim 24 | sanitizing and softening a laundry item [that has been] treated with an alkaline detergent | contacting the treated laundry items with a peracid composition comprising hydrogen peroxide, an organic carboxylic acid, and a resulting organic peracid |
| DE335 (per Ecolab)<br><br>Doc. 49-5 ¶ 0008 | first step of contacting soiled laundry items with an alkaline detergent | contacting these items with an organic peracid composition |

Thus, no one can reasonably dispute the processes specified in at least these claims of the '013 patent were known in the prior art.  Again, this is based on Ecolab's own

explanation of DE335, and therefore, Ecolab cannot deny knowing these processes were described and taught by the prior art.

There is simply no legitimate explanation for Ecolab's inconsistent assertions except that Ecolab sought to utilize the present litigation as a sham to interfere with one of its competitors. Knowingly asserting invalid patent claims is actionable under the antitrust laws. <u>Handgards v. Ethicon</u>, 601 F. 2d. 286 (9th Cir. 1979).

Under the mistaken belief that Ecolab would reconsider the filing of the present lawsuit in view of the clear invalidity of the claims in the '013 patent, Gurtler brought Ecolab's prior statements to Ecolab's attention early on in the present case. <u>Exhibit C.</u> However, Ecolab simply refused to even consider the facts and opted to remain willfully ignorant of the prior art—in spite of its previous opinions on the exact same reference. <u>Exhibit D.</u>

As discussed in more detail below, in view of Ecolab's continual efforts to obscure the full disclosure of DE335 from the USPTO, Gurtler filed a second *ex parte* reexamination at the USPTO based on DE335. Less than one month after the USPTO was provided with the full disclosure of DE335, the USPTO found that DE335 raised a substantial new question of patentability as to the '013 patent. <u>Exhibit E</u>, pages 8-11. Shortly thereafter, the USPTO rejected each and every one of the claims of the '013 patent based on DE335, alone or with other references, including Ecolab's own admissions of the prior art. <u>Exhibit F</u>, pages 6-9. In response to these rejections (and the affirmance of the substantive rejections of the claims by the Patent Trial and Appeals Board ("PTAB") in the first reexamination), Ecolab ultimately had no choice but to

finally admit that the claims of the '013 patent were unpatentable in view of DE335 and either cancelled or substantively amended each and every original claim.  <u>Exhibit G</u>, pages 4-9.

It was plainly clear that the original claims of the '013 patent were defectively broad—including to Ecolab as shown by its own statements regarding the prior art.  Thus, Ecolab's position was extremely weak, and the weakness was evident from its own statements.  When this weak position is coupled with Ecolab's other actions (and inactions), the exceptionality of the present case is clear.

### B.     There Is Ample Evidence Of Inequitable Conduct

While a finding of inequitable conduct is not required by this Court, as noted above, the facts supporting such a finding are relevant to the totality of the circumstances finding this case exceptional.  There are two factual patterns that should be explored as being highly relevant to the present inquiry: Ecolab's actions relative to DE335; and Ecolab's failure to disclose other material references.

> 1.     Ecolab attempts to hide the full disclosure of DE335
>            from the USPTO

The '013 patent characterizes DE335 as disclosing:

> peroxy salts and peroxy generating compounds as well known detergent additive compositions that can be incorporated into laundry chemical compositions to use the peroxy function as a bleaching material. [DE335] suggests that these peracid materials are effective bleaches, ***but fail to emphasize that these materials can be used in a laundry step after the alkaline detergent in a stage that sanitizes, softens and neutralizes alkaline residues***.

<u>Doc. 1-1</u>, page 3, col. 2 lines 8-16 (emphasis added).  This characterization of DE335 is, at best, misleading.  Rather, DE335 states:

> The method according to the invention substantially comprises the addition of, instead of an organic acid, *a mixture of an organic peroxyacid with an organic acid* to the ***final rinsing bath*** in a continuous flow laundry system, such that the concentration of active oxygen from the peroxyacid in the rinsing bath is sufficient for ***preventing the development of a permanent germ colony***, and ***to kill germs*** that may still be present in the washed laundry.

Exhibit H, page 5 (emphasis added).  It is false to say that DE335 "fails to emphasize" using the peracid mixture after the alkaline detergent when DE335 plainly describes the invention as adding such a peracid mixture in a "final rinsing bath" "to kill germs." Thus, the characterization of the DE335 included the '013 patent is not accurate.  During the original prosecution, Ecolab was most certainly aware that this characterization was wrong.

The '013 patent issued on July 17, 2001.  Doc. 1-1 page 2.  More than a year before issuance, the European Patent Office ("EPO") mailed a search report identifying various references as being relevant to the claims in Ecolab's European counterpart patent application.  Exhibit I.  Despite its obligation under the USPTO rules, Ecolab did not disclose the existence of this search report to the USPTO or any new references cited therein.  Doc. 19, ¶¶ 13 and 15-18.

Months before the '013 patent issued, the EPO issued an examination report rejecting the claims in Ecolab's European counterpart patent application in view of DE335.  Exhibit J; Doc. 19, ¶¶ 19-22.  In the examination report, the EPO specifically stated that DE335

> discloses a laundry cleaning method comprising application of an organic peracid composition to said laundry in a step subsequent to treatment with an alkaline detergent. The addition of the peracid composition effectively neutralises and disinfects the treated laundry. The method is free of a permanganate component.

Thus the subject matter of claims 1, 13 and 14 is anticipated by [DE335], and is therefore not novel in the sense of Article 52(1) EPC.

Exhibit J, page 2.

Once again, despite its obligation under the USPTO rules, Ecolab did not disclose this examination report to the USPTO.  Doc. 19, ¶ 20.  Approximately one month after the '013 patent had issued, Ecolab responded to the EPO examination report by amending the claims of the European counterpart patent application.  Exhibit B, page 1.

Ecolab could have corrected its characterization of DE335 or disclosed the EPO search report or the EPO examination report to the USPTO, as its obligations required it to.  Ecolab chose to do nothing.  Had the USPTO been given the opportunity to consider the full content of DE335[3], and not only what Ecolab wanted the USPTO to consider, the '013 patent would had never issued—at least in its original form—and this case would have never been filed.  Instead, Ecolab opted to obscure the teachings of DE335 by only disclosing a translation of the abstract and failing to correct the mischaracterization of DE335 contained in the '013 patent.  Ecolab's strategy to conceal the full scope of DE335 from the USPTO continued through the reexaminations of the '013 patent.

In November 2014 during the initial stages of discovery in this case, Gurtler provided Ecolab with a computer-generated English translation of DE335.  Exhibit L.  Months later, in the first reexamination, when Ecolab filed an Information Disclosure Statement ("IDS") which included over 170 listings of references and other information,

---

[3]During the original prosecution Ecolab provided the USPTO with a copy of DE335 (in German) and only a translated abstract.  Exhibit K, page 4.

missing from the IDS was the English translation of DE335 provided by Gurtler.  <u>Doc. 49-4</u>, pages 11-14.

Apparently, rather than provide the USPTO with the English translation of DE335 Gurtler provided to Ecolab, Ecolab made the strategic decision to obtain and cite WO 91/03590, an application related to DE335.  <u>Doc. 49-4</u>, page 14.  Interestingly, the date on the translation of WO 91/03590 is May 5, 2015, months after Gurtler provided Ecolab with a translation of DE335.  <u>Exhibit M</u>.  Not only does the decision to obtain a different version of DE335 raise issues as to Ecolab's true intention, Ecolab made sure to bury that reference on the IDS with 170 other references—giving the Examiner at the USPTO little chance to review what everybody (except the Examiner at the USPTO) knew was the most important reference.

Additionally, despite being reminded about the EPO search report and EPO examination report by Gurtler, Ecolab intentionally chose not to cite those in its IDS.  <u>Doc. 49-4</u>.  Ecolab had no problem citing numerous other office actions from other US patent applications on its IDS, but not the ones from the EPO in which substantially identical claims were rejected based on DE335.  <u>Doc. 49-4</u>.

Furthermore, during the reexaminations Ecolab failed to correct the misstatements in the '013 patent relating to the full teachings of DE335.  No rule prohibited Ecolab from amending the statements in the '013 patent during reexamination.  However, doing so would have clearly focused the USPTO's attention to the full teachings of DE335, a disclosure which Ecolab knew rendered the claims of the '013 patent invalid.

Accordingly, since Ecolab continued to shirk its duty, Gurtler was compelled to ensure that the USPTO considered the full teachings of DE335 in assessing the validity of the '013 patent claims. Thus, Gurtler filed the second reexamination. As noted above, the main reference of the second reexamination was DE335. Exhibit F.

It was not until *after* Gurtler filed its second reexamination and that reexamination was granted, that Ecolab finally decided to disclose the full teachings of DE335 to the USPTO. Exhibit N. However, at this point, it was too little too late.

When finally given the opportunity by Gurtler to fully consider DE335, the USPTO rejected each and every claim of the '013 patent based on DE335. Exhibit F. In response to these rejections, Ecolab conceded[4] what it had to know all along, that the claims of the '013 patent were not valid in view of DE335. Exhibit G. Had Ecolab acted properly at the outset, or even acknowledged its prior statements, this case would never have been filed because the '013 patent would have never issued as it did. These actions, or inactions, of Ecolab relative to DE335 show how this case is exceptional and stands out from one in which the asserted patent claims were merely found invalid.

In addition to Ecolab's actions obscuring the teachings of DE335, Ecolab's failure to cite other known and material references support a finding of an exceptional case.

---

[4]This is almost two months after Ecolab gave up on the original claims of the '013 patent in the first reexamination. Exhibit II.

## 2.    Ecolab failed to disclose numerous other material references

All but one of the references relied on by the USPTO in the first reexamination were known to Ecolab before the '013 patent issued—yet they were never disclosed to the USPTO during the original prosecution.

For example, U.S. Pat. No. 5,200,189 ("US189", Exhibit O) was cited in the first reexamination as raising a substantial new question of patentability for the claims of the '013 patent. Doc. 35-1, page 5. US189 was the main reference used to reject the claims of the '013 patent in the first reexaminations, rejections that were affirmed by the PTAB *twice*. Doc. 43-1, pages 6-9; Exhibit P; Exhibit BB. US189 is one of Ecolab's own patents. Exhibit O. However, beyond being known generally to Ecolab since it is one of its own patents, US189 was known to inventor Hei of the '013 patent because US189 is described in another patent application filed by Ecolab naming inventor Hei as an inventor of that patent too.

Specifically, U.S. Pat. No. 6,024,986 ("US986", Exhibit Q), filed before the application that lead to the '013 patent was filed, acknowledges that US189 "describes peroxy acid antimicrobial compositions." Exhibit Q col. 1 lines 58-60. Furthermore, as found by the Examiner at the USPTO and the PTAB, US189 describes these compositions as being used in laundry processes. Exhibit P, pages 3-4. Given that the claims of the '013 patent were rejected in view of US189, it is indisputable that US189 is material to the claims of the '013 patent. Yet, US189 was never disclosed to the USPTO by Ecolab.

Similarly, U.S. Pat. No. 5,437,868 ("US868", <u>Exhibit R</u>) is another patent owned by Ecolab which was indicated as raising a substantial new question of patentability in the first reexamination. <u>Doc. 35-1</u>, page 6. As with US189, US986 describes US868 as teaching methods of making peroxycarboxylic acids for antimicrobial uses. <u>Exhibit Q</u> col. 5 lines 42-45. As discussed above, US986 was filed by Ecolab before the '013 patent was filed and names inventor Hei, one of the inventors of the '013 patent, as its inventor. <u>Id</u>. As with US189, US868 was a material reference that was never disclosed by Ecolab during the original prosecution of the '013 patent.

Furthermore, U.S. Pat. No. 4,051,059 ("US059", <u>Exhibit S</u>) is another reference from the first reexamination that was indicated as raising a substantial new question of patentability. <u>Doc. 35-1</u>, pages 6-7. US059 was known to Ecolab because it has been discussed, or at least cited, in at least 24 Ecolab patents[5], nine of which share at least one inventor with the '013 patent and some of which share two inventors with the '013 patent. <u>Exhibit T</u>. Furthermore, US986 specifically describes US059 as follows:

> Peroxy compounds; notably, peroxy acid/hydrogen peroxide compositions, are well known in the prior art as sanitizing materials. Particularly, the Grosse Bowing patents, U.S. Pat. Nos. 4,051,058 and 4,051,059, disclose basic formulation materials in stabilizing peroxy acetic acid/hydrogen peroxide compositions using sulfonate or phosphonate stabilizing agents. The prior art regarding the use of these materials has developed actively. Also, the Grosse Bowing patents describe stabilized peracid materials using sulfonate and phosphonate stabilizing agents.

---

[5]<u>Exhibit T</u>, collectively coversheets of U.S. Pat. Nos.: 5,122,538; 5,139,788; 5,200,189; 5,314,687; 5,409,713; 5,436,008; 5,578,134; 5,674,538; 5,683,724 (one common inventor); 6,024,986 (one common inventor); 6,028,104; 6,165,483 (one common inventor); 6,238,685 (one common inventor); 6,257,253; 6,302,968; 6,326,032; 6,436,445 (two common inventors); 6,479,454 (two common inventors); 6,534,075 (two common inventors); 6,545,047; 6,627,593 (one common inventor); 6,627,657; 7,060,301 (one common inventor); and 7,150,884.

Exhibit Q col. 1 lines 36-54.

Thus, it cannot be denied that Ecolab and at least two inventors from the '013 patent were well aware of the teachings of US059. However, US059 was never disclosed by Ecolab to the USPTO during the original prosecution of the '013 patent.

Finally, WO 95/28471 (Exhibit U) was also indicated as raising a substantial new question of patentability in the first reexamination. Doc. 35-1, page 6. This reference is owned by Ecolab and was cited by the EPO in the search report in the corresponding EP application discussed above. Exhibit U; Exhibit I. However, the EP search report, as discussed above, and WO 95/28471 were never brought to the attention of the USPTO by Ecolab.

US189, US868, US059, and WO 95/28471 are material references to the '013 patent based on the USPTO indicating that each raised a substantial new question of patentability to the claims of the '013 patent. Doc. 35-1. Additionally, each of these material references were known to persons at Ecolab but were never disclosed to the USPTO by Ecolab.

In sum, Ecolab actions, or rather its inactions, resulted in the USPTO granting the '013 patent with fatally invalid claims—claims that Ecolab asserted in the present case against Gurtler. Had Ecolab merely acted properly from the outset, Gurtler would have never had to defend itself in this case. Again, while there is no need to find inequitable conduct since all claims of the '013 patent are invalid, these underlying inequitable conduct facts only further support Gurtler's position that this case is exceptional.

### C.    Ecolab Keeps Case Hanging Over Gurtler For As Long As Possible

However, this case was filed, and Ecolab refused to acknowledge the facts and instead opted to push this case forward.  Exhibit D.  Even with this case stayed while the reexaminations were pending, Ecolab went to great lengths to keep this case pending.  Indeed, Ecolab's repeated complaints to this Court about the delay associated with the *ex parte* reexamination process were belied by its actions needlessly dragging out the reexaminations for as long as possible—thus, keeping the lawsuit hanging over Gurtler.  Additionally, it was not until two years after Ecolab gave up the original claims, did Ecolab finally offer to dismiss the case.  These actions make this case stand out further from a typical patent case.

In the reexaminations, Ecolab could have taken actions to speed up the processes, but it chose not to.  For example, Ecolab could have waived a two-month period so that the USPTO would provide a first action sooner, but twice Ecolab chose not to.  Doc. 41-1; Exhibit V.  Ecolab could have filed responses early, but Ecolab chose not to—often waiting for the last day or shortly therebefore to file its responses.  Further, Ecolab often sought extensions of time to respond during the reexaminations.  Its statements in at least two of these requests demonstrate Ecolab's true motivation and purpose for bringing the present lawsuit and dragging out the reexaminations.

Approximately a month and a half after losing its first appeal at the PTAB, Ecolab requested an extension of time to take its next action stating, "The Board's Decision of September 8, 2016 affected a number of different issues concerning the outstanding and new rejections, and (as acknowledged by the Board) introduced a new theory of

rejection." <u>Exhibit W</u>, page 2.  Of course these "new rejections" were merely a result of procedural issues and this was quickly recognized by the PTAB which denied the request for more time stating: "The new ground of rejection in the decision only involves one claim, claim 25….the rejection of claim 15 under §103(a) based on Oakes—the same reference used to newly reject claim 25 under §103(a)—was affirmed."  <u>Exhibit X</u>, page 14.  Thus, it was clear to the PTAB that the "new" rejection was anything but new.  Thus, this request for more time to consider the "new" rejection was disingenuous at best.

A similar questionable request was made by Ecolab after the USPTO issued the first Office Action in the second reexamination.  Specifically, on November 14, 2016, Ecolab stated that additional time was needed "to consult an expert… to investigate the technical issues presented by the Examiner in the October 6, 2016 Office Action." <u>Exhibit Y</u>, page 2.  Interestingly, this request for an extension of time was submitted ***one week after*** Ecolab abandoned the original claims of the '013 patent in the first reexamination.  <u>Exhibit II</u>, page 24.

Furthermore, after being granted this extension in the second reexamination, Ecolab merely submitted the same expert report it used years before—a report that was found to be unpersuasive by the Examiner and the PTAB.  <u>Exhibit Z</u>; <u>Doc. 51</u>.  Indeed, Ecolab did not even bother to change the header, or change the date from the original expert report.  <u>Exhibit Z</u>; <u>Doc. 51</u>.

While it was Ecolab's right to seek these extensions of time, Ecolab had complained *ad nausem* to this Court about how the reexamination process was too long. <u>Doc. 30</u>; <u>Doc. 46</u>; <u>Doc. 50</u>.  When given the opportunity to speed up the reexamination

process it so strongly complained of, Ecolab did the exact opposite—it tried to draw them out and make them last longer. Given Ecolab's numerous attacks of the reexamination timeline, its strategic decisions to draw out those reexaminations, especially in view of the questionable basis for the extensions, support Gurtler's assertion that the true purpose of the present case was nothing more than to harass Gurtler and to do so with the uncertainty of a pending lawsuit for as long as possible.

In one final attempt to subject Gurtler to baseless patent claims, ***two years after*** conceding that the original patent claims were not valid in the reexamination (Exhibit II), Ecolab finally offered to dismiss this case. Exhibit AA. However, the terms of the dismissal required Gurtler to agree not to practice the processes of the ***amended*** claims presented by Ecolab in the reexaminations. Id. These amended claims had been rejected by the Examiner in the reexaminations and the PTAB (Exhibit BB), and Ecolab originally appealed those rejections to the Federal Circuit (Exhibit CC), but that appeal was recently dismissed (Exhibit DD). In other words, these amended claims were never valid patent claims. Yet Ecolab, with one last attempt to inflict pain on Gurtler, offered to dismiss the case provided Gurtler agree not to practice claims that were never valid or issued. This settlement offer was rejected by Gurtler. Exhibit AA.

Even though this Court rightly stayed the present case while the USPTO reexamined the '013 patent, Ecolab was still able to use this case as a silent and continuous threat to Gurtler, and Ecolab made sure that the reexaminations were drawn out long enough for nearly the full length of its patent, so that Ecolab could act as if the '013 patent had never been found invalid.

Upon examining the totality of these circumstances, this Court will see that this case stands out. Ecolab's patent claims were exceptionally weak, and the weakness was evident based on Ecolab's own statements. When reminded of its early admissions about the prior art, Ecolab chose to ignore its statements and press on in the present case as if its prior admissions did not matter. Many of the references used in the reexamination were known to Ecolab during the original prosecution, but Ecolab chose not to cite these material references to the USPTO. During the reexaminations, Ecolab took great action to continue its course of obscuring and concealing the full disclosure of DE335 from the USPTO for as long as possible. Finally, Ecolab's actions demonstrate a strategic plan of drawing out the reexaminations and refusing to dismiss this case until as late as possible to improperly use this case as a means to inflict harm on its competitor.

After reviewing the totality of these actions, this Court should conclude that this case stands out under 35 U.S.C. § 285, and award reasonable attorney's fees to Gurtler.

## III. GURTLER'S REQUESTED FEES ARE REASONABLE

Gurtler requests this Court award it its reasonable attorney's fees and costs of $196,194.10[6] for services it incurred related to this case. As demonstrated below, these fees are reasonable.

The "lodestar" method for calculating reasonable attorney fees has "become the guiding light of [] fee-shifting jurisprudence." Perdue v. Kenny A, 559 U.S. 542, 551 (2010). The lodestar method analyzes the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433

(1983).  There is a "strong presumption that the lodestar figure represents a reasonable attorney fee." <u>Bywaters v. United States</u>, 670 F.3d 1221, 1229 (Fed. Cir. 2012) (internal quotation marks omitted).  In calculating reasonable attorney fees, "trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." <u>Fox v. Vice</u>, 563 U.S. 826, 838 (2011) (*quoting* <u>Hensley</u>, 461 U.S. at 437). Accordingly, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." <u>Id</u>.

As demonstrated below, the rates and amounts charged to Gurtler were more than reasonable.

### A.    The Rates Charged Are Reasonable

The "reasonable hourly rate" used in the Lodestar calculation is determined by looking to prevailing rates in the forum "for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Bywaters</u>, 670 F.3d at 1234.  As will be shown below, each of the firms retained by Gurtler charged rates that were more than reasonable under this standard.

#### 1.    GBC's rates are reasonable.

The vast majority of the work done for Gurtler was done by the law firm of Greer Burns and Crain ("GBC") and specifically by Mr. Kevin Guynn and Mr. Patrick Smith. GBC is an intellectual property law firm based in Chicago, Illinois.

---

[6] This amount does not include fees or costs incurred with brining the present Motion.

Both Mr. Guynn and Mr. Smith are partners at GBC and are patent attorneys, having over 25 years and 15 years of experience, respectively. During the present lawsuit, Mr. Guynn's billing rate was between $425-440/hr. Exhibit EE. Similarly, Mr. Smith's billing rate was between $265-310/hr. Id.

According to a 2015 AIPLA survey, for patent attorneys based in Minnesota, the average billing rate of a partner in an IP firm was $399 and the average billing rate of an associate in an IP firm was $240. Exhibit FF, pages 2 and 3. Additionally, for patent attorneys based in Chicago, the average billing rate was $452 and the average billing rate of an associate in an IP firm was $418. Id. In the 2017 AIPLA survey, these average billing rates were $484 (Minnesota, partner), $562 (Chicago, partner), $294 (Minnesota, associate), and $351 (Chicago, associate). Id. at pages 7-8. Since the rates charged by GBC are close to, if not below, these reported average amounts for similar services, the rates charged by Mr. Smith and Mr. Guynn are reasonable.

The additional attorneys at GBC who performed work for Gurtler had rates of $140/hr (clerk), $165/hr (associate), and $335/hr (partner). Exhibit EE. As these rates are at or below the reported average amounts discussed above, these rates are reasonable.

Thus, the rates charged by the GBC attorneys are reasonable.

### 2.    GKWW's rates are reasonable.

The majority of the work done for Gurtler by its primary law firm, Gardiner, Koch, Weisberg & Wrona ("GKWW"), based in Chicago, Illinois, was done by Mr. Tom Gardiner and Mr. Barry Owen.

Mr. Gardiner and Mr. Owen are litigators having over 25 years and 15 years of experience, respectively.  GKWW handled the initial dispute resolution attempts and then, once patent counsel from GBC was engaged, GKWW, due to its long-standing relationship with Gurtler, stayed on to act as a quasi-general counsel to Gurtler. Declaration of Barry C. Owen, herewith.

During the present lawsuit, Mr. Gardiner's billing rate was $250/hr.  Declaration of Barry C. Owen; Exhibit GG.  Additionally, Mr. Owen's billing rate was between $325-375/hr.  Declaration of Barry C. Owen; Exhibit GG.  The rates charged are believed to be reasonable based on GKWW's longstanding relationship with Gurtler and their proximity to the reported average amounts from the AIPLA surveys discussed above. Exhibit FF, pages 2, 3, 7, and 8.

### 3.    Local counsel charged reasonable rates

Finally, as required under the Local Rules, Gurtler retained local counsel, Patterson Thuente Pedersen, P.A., which billed Gurtler $8,469.67 for its services in the present lawsuit.  Exhibit HH.  This amount is believed to be reasonable for the services rendered by Patterson Thuente Pedersen, P.A. as local counsel in this case.

### B.    The Amount Of Time Billed Is Reasonable

During this lawsuit, Gurtler has been regularly invoiced for legal services by its firms.  Gurtler regularly paid these invoices. It is submitted that the hours and amount of time spent on securing Gurtler's victory were extremely reasonable, especially given the results achieved in the face of a very aggressive offense by Ecolab.

The firms have generally used the same type of calculation for its bills, namely each attorney's reasonable standard hourly rate multiplied by the reasonable number of hours spent working the matter.[7]  Exhibit EE; Exhibit GG; Exhibit HH.  The legal services provided to Gurtler are described in detail in the submitted invoices.  Exhibit EE; Exhibit GG; Exhibit HH.  Additionally, the related costs incurred by Gurtler's attorneys are also described in the attached invoices.  Exhibit EE; Exhibit GG; Exhibit HH.  These costs are directly related to the legal services provided, and include, for example, travel expenses for hearings, filing fees for the reexaminations, admission fees, copying and delivery services, postage, and external costs for an invalidity search.  Exhibit EE; Exhibit GG; Exhibit HH.  These costs were directly related to this dispute and are reasonable.

The Federal Circuit interprets "attorney fees to include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." Central Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1578 (Fed. Cir. 1983). Accordingly, many courts have awarded attorney fees incurred in USPTO proceedings initiated in response to claims for patent infringement under 35 U.S.C. § 285. IA Labs CA, LLC v. Nintendo Co. Ltd., No. 10-833, 2012 U.S. Dist. LEXIS 61080, at *12 (D. Md. May 1, 2012) (granting attorney fees related to a reexamination proceeding before the PTO); PPG Indus. v. Celanese Polymer Specialties Co., 840 F.2d 1565, 1568-69 (Fed. Cir. 1988) (reversing the District Courts denial of attorney fees

---

[7] For one matter, Gurtler and GBC agreed to a flat fee for attending a hearing at the USPTO.  Exhibit EE, page 59.

incurred during a reissue proceeding before the patent office); <u>Howes v. Medical Components Inc.</u>, 761 F. Supp. 1193, 1198 (E.D. Pa. 1990) (awarding fees for reexamination proceeding).

The costs and fees Gurtler expended in filing the two reexaminations were directly related to this litigation. Indeed, the reexaminations resulted in the all original claims of the '013 patent being found invalid. Since the reexaminations resulted in the invalidity of the claims of the '013 patent, the reexaminations were more than related to this lawsuit; they were an integral part of the successful outcome of this litigation for Gurtler. Thus, those fees should be included the fee award.

It has been recognized in this Court that, "[p]atent litigation is notoriously expensive." <u>MTS Sys. Corp. v. Hysitron Inc.</u>, 639 F. Supp. 2d 996, 1006 (D. Minn. 2009) (finding $949,826.43 fees by Merchant & Gould were reasonably expended in a case with one patent that was voluntarily dismissed long before trial). The requested fees are significantly lower than those in the <u>MTS Sys. Corp</u> case.

Additionally, since Gurtler obtained a complete victory relative to processes which, based on Ecolab's breadth of discovery have sales that exceed $1 million, the fees are believed to be reasonable. <u>Bywaters</u>, 670 F.3d at 1230 (the "amount involved and results obtained" is a factor in determining a reasonable attorney fee). Indeed, according to the 2015 AIPLA survey, patent litigation in Minnesota, through discovery, typically costs over $1 million for a single patent with $1-10 million at risk. <u>Exhibit FF</u>, page 5. According to the 2017 AIPLA survey, initial case assessment for patent litigation in

Minnesota for a single patent with $1-10 million at risk typically costs $82,000, and through discovery costs $658,000.  Exhibit FF, page 10.

While discovery in this case was not complete prior to the stay and ultimate dismissal, the fact that Gurtler spent less than one quarter of the average amount reported by the 2015 AIPLA survey, and less than half of the amount reported by the 2017 AIPLA survey supports the reasonableness of Gurtler's fees.  Specifically, even though case was stayed, Gurtler still had to:

> prepare for an attend Rule 26 and 16 conferences;

> respond to multiple discovery requests;

> negotiate a protective order;

> prepare its own discovery;

> prepare and review documents and things for production;

> respond to multiple demands for meet and confer conferences, letters, and other correspondence from Ecolab's counsel;

> monitor the pending reexaminations and prepare strategic decisions based on the actions in same; and,

> prepare and file multiple submissions to the Court regarding the stay—including many of the status reports.

Thus, the fees are believed to be reasonable in view of the actions undertaken by Gurtler's attorneys.

Similarly, an average attorney's fees for preparing a *single* request for a reexamination in Minnesota, according to the 2015 AIPLA survey, was $39,833, while in 2017 that average attorney's fees dropped to $18,067.  Exhibit FF, pages 5 and 9.  The

costs and attorney's fees Gurtler incurred for its *two* reexaminations are approximately $32,248.05. <u>Exhibit EE.</u>    Since these are both at or below the averages for similar services in Minnesota according to the AIPLA surveys, these amounts are reasonable.

Gurtler's attorneys appropriately staffed the case and sought to, and did, economically defend against the claims of infringement brought by Ecolab. Accordingly, while the amounts are lower than the average amounts, they are still significant amounts that Gurtler should be reimbursed in view of the exceptional nature of this case. Finally, it is worth noting, as discussed above, if Ecolab only acted properly at the outset, this case would have never been brought.

## IV.    CONCLUSION

Gurtler is the prevailing party in this case, a case that is exceptional in view of the weakness of Ecolab's case. While Ecolab provided the source of the invalidating prior art; it refused to acknowledge its own statements, instead subjecting Gurtler to the costs, uncertainty, and inconvenience associated with the present lawsuit. While Gurtler has prevailed against the claims of infringement, Ecolab's actions stand out from those of a typical patentee and they support a finding that this case is exceptional.

Accordingly, Gurtler requests that this Court award it at least its reasonable attorney's fees and cost under 35 U.S.C. § 285 of $196,194.10.

DATED: April 2, 2019

Respectfully Submitted,

By: */s/ Patrick J. Smith*

Eric H. Chadwick (#0248769)

chadwick@@@ptslaw.com
Aaron W. Davis (#0318255)
davis@ptslaw.com
PATTERSON THUENTE PEDERSEN, P.A.
400 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2010
Telephone: 612-349-5740
Facsimile: 612-349-9266

Thomas G. Gardiner (pro hac vice)
tgardiner@gkwwlaw.com
Barry C. Owen (pro hac vice)
bowen@gkwwlaw.com
GARDINER, KOCH, WEISBERG & WRONA
53 W. Jackson Blvd. Suite 950
Chicago, IL 60604
Telephone: 312-362-0000
Facsimile: 312-362-0440

Kevin W. Guynn (pro hac vice)
kguynn@gbclaw.net
Patrick J. Smith (pro hac vice)
psmith@gbclaw.net
GREER, BURNS & CRAIN
300 S. Wacker Drive, Suite 2500
Chicago, IL 60606
Telephone: 312-360-0080
Facsimile: 312-360-9315

***ATTORNEYS FOR GURTLER
INDUSTRIES, INC.***